UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD JOSHUA SMITH, | No. 2:21-cv-00420-JAM-EFB P |
| Plaintiff, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| OMONIYI AKINTOLA, | |
| Defendant. | |

Plaintiff is a state prisoner proceeding without counsel in an action brought pursuant to 42 U.S.C. § 1983.  Defendant moves for summary judgment.  ECF No. 34.  For the reasons that follow, the motion must be granted.

**I.      The Complaint**

Following screening under 28 U.S.C. § 1915A (ECF No. 9), a single claim remains – plaintiff's claim that defendant Akintola, a physician's assistant who was plaintiff's primary medical provider at California Health Care Facility – Stockton ("CHCF"), was deliberately indifferent to plaintiff's medical needs by ignoring the information plaintiff relayed to him about his medical condition in response to plaintiff's March 2019 sick-call request.  ECF No. 7 at 3.  Plaintiff alleges that he experienced chest pain and shortness of breath possibly due to exposure to water contaminated by Legionnaire's Disease, but defendant refused to examine or treat these

/////

1

symptoms.[1]  *Id.*  Plaintiff claims that this refusal caused his health to decline and that he developed many ailments as a result.  *Id.* at 3-4.  Plaintiff also alleges that, after he was diagnosed with an unidentified disease of the abdomen on January 23, 2019, defendant failed to follow up to ensure that plaintiff received treatment for the disease.  *Id.* at 4.

## II.    The Parties' Factual Contentions and Evidence

Defendant has produced records of the medical care he provided to plaintiff between March 4, 2019 and July 13, 2020, when he acted as plaintiff's primary care provider.  ECF Nos. 34-3 (Akintola Dec.) & 34-5 (plaintiff's medical records).  These records show that plaintiff did not have any interactions with defendant during March 2019 in which he complained of coughing or shortness of breath.  ECF No. 34-5 at 74-79.  In fact, examinations of plaintiff in March 2019 revealed no respiratory abnormality.  *Id.* at 77 (noting plaintiff's lungs were "clear to auscultation bilaterally" and had "no wheezes" on March 4, 2019), 76 (plaintiff did not complain of symptoms of Legionnaire's disease and denied shortness of breath, cough, and difficulty breathing on March 10, 2019), 75 (plaintiff seen for complaint of back pain on March 24, 2019, lungs were clear to auscultation bilaterally, no wheezes), 74 (plaintiff seen for back pain on March 27, 2019, lungs were "CTA" [presumably "clear to auscultation"] and showed "good breath sounds").  The records contain no notation that any care provider was concerned that plaintiff had contracted Legionnaire's disease, nor do they indicate that plaintiff was suffering from an abdominal ailment that required treatment that plaintiff was not receiving.

Plaintiff requested health care services on April 18, 2019, because he had "throw-up, back pain, cough-up and shortness of breath [and was] constantly going to the bathroom."  *Id.* at 31.

---

[1] "Legionnaires' disease is a condition of severe pneumonia caused by Legionella, an aerobic gram-negative bacillus."  Brady & Sundareshan, "Legionnaire's Disease," last updated July 18, 2021, accessed at https://www.ncbi.nlm.nih.gov/books/NBK430807/ (last checked May 4, 2022).  "Patients present with fever, chills, and a dry or wet cough producing sputum.  One-third of those affected cough up blood.  Some also have muscle aches, headache, tiredness, loss of appetite, loss of coordination (ataxia), chest pain, or diarrhea and vomiting, and neurological symptoms including confusion and impaired cognition.  Relative bradycardia also may be present, which is low or low-normal heart rate despite the presence of a fever."  *Id.*  There is no dispute between the parties that an outbreak of Legionnaire's disease impacted the prison during 2019.

Plaintiff was seen by Pooja Bassi, RN, on April 19, 2019, in response to the request. *Id.* at 81-86. However, his respiratory exam showed no abnormality. *Id.* at 83 (breathing even and unlabored, no cough noted, breath sounds clear, and regular respiratory pattern). Nurse Bassi told plaintiff to use Tylenol and capsaicin cream for his back pain, "[e]ducated [him] about Legionnaire's disease and how to protect [him]self," and "encourage[d] [plaintiff] to notify medical staff for any symptoms like cough, fever, headache, [or] muscle aches." *Id.* at 87. There is no indication in the chart that plaintiff told Nurse Bassi that he was concerned he had contracted Legionnaire's disease or that her exam of plaintiff alerted her that he may have contracted it. Nor is there any indication that plaintiff complained of symptoms related to an abdominal ailment that needed treatment. Defendant was not involved with the April 19, 2019 appointment with Nurse Bassi. ECF No. 34-3 at 4.

Plaintiff was seen on April 28, 2019 by Dr. Yash Brar concerning his chronic low back pain. ECF No. 34-5 at 73-74. His respiratory exam revealed no cough or shortness of breath. *Id.* at 73. Defendant was not involved in the exam. ECF No. 34-3 at 4. Defendant did not see plaintiff at all in April 2019. *Id.*

On May 3, 2019, plaintiff saw Dr. Kathy Christopher complaining of chest pain and shortness of breath over the previous 5-7 days. ECF No. 34-5 at 71. Plaintiff's lung exam was clear, but because of plaintiff's history of smoking, hypertension, and abnormal EKG, Dr. Christopher referred him out to San Joaquin General Hospital for further evaluation and "to rule out acute coronary syndrome." *Id.* at 72. There is no indication in the chart that Dr. Christopher suspected, or had cause to suspect, that plaintiff had Legionnaire's disease. Nor is there any indication that plaintiff suffered from an untreated abdominal ailment.

At San Joaquin General on May 6, 2019, plaintiff's lungs again were clear with no wheezing on examination. *Id.* at 88, 99. After various diagnostic tests, Dr. Saeid Ghaemmaghami suspected that plaintiff's symptoms were caused by hypertrophic cardiomyopathy. *Id.* at 88. He recommended that plaintiff follow up in a cardiology clinic. *Id.* In the many pages of records of the diagnostic testing, examinations, and medical opinions from plaintiff's hospitalization, no medical care provider indicated that plaintiff exhibited symptoms of

Legionnaire's disease or should be tested for Legionnaire's disease. *Id.* at 88-120.  Rather, the consensus of these providers was that plaintiff had a coronary ailment. *Id.*

Plaintiff saw defendant on May 13, 2019 for a follow-up after his hospitalization. *Id.* at 69.  Defendant noted that acute coronary syndrome had been ruled out, that plaintiff's chest pain had resolved, and that plaintiff had been referred to cardiology for an MRI. *Id.*  Plaintiff's lungs were clear on examination. *Id.* at 70.  Defendant put in a request for the MRI. *Id.*

Defendant referred plaintiff for a transthoracic echocardiogram on June 2, 2019. *Id.* at 4. At an appointment on June 6, 2019, defendant noted that an MRI of plaintiff's heart had been recommended but not completed, as had an endoscopy due to a prior test indicating a condition called Barrett's esophagus.  *Id.*  Plaintiff told defendant that the gastroenterologist had informed him that the planned endoscopy had been cancelled until plaintiff had been cleared by cardiology, because an echocardiogram had revealed hypertrophic cardiomyopathy. *Id.*  Defendant referred plaintiff to gastroenterology but with a note that the appointment should not be scheduled until the heart MRI had been completed. *Id.* at 29.  On June 11, 2019, defendant referred plaintiff to a pulmonologist. *Id.* at 28.

Defendant saw plaintiff next on June 25, 2019, after plaintiff had seen a cardiologist. *Id.* at 67.  Plaintiff had seen the cardiologist "for preoperative clearance for a stomach surgery and possible bullet extraction." *Id.* at 68.  The cardiologist had recommended an MRI of the heart and cardiac catheterization. *Id.*  At the exam, plaintiff had no respiratory complaints. *Id.*  Defendant noted that requests had already been submitted for the MRI and catheterization, and that he would see plaintiff after those procedures had been done. *Id.*

On July 9, 2019, plaintiff saw defendant, who noted that the MRI and catheterization procedures had not yet been done, but that plaintiff had seen a pulmonologist. *Id.* at 67. Defendant requested that plaintiff be given a "six-minute walk test" and sent out a request for a copy of plaintiff's recent echocardiogram as requested by the pulmonologist. *Id.*  He noted that he would follow up in a month on the various tests that needed to be performed and then refer plaintiff back to pulmonology and cardiology. *Id.*  Defendant saw plaintiff the following week after plaintiff had received an MRI, which revealed a thickened or enlarged left ventricle. *Id.* at

4

65. Plaintiff had also received the catheterization and a coronary angiography. *Id.* Defendant sent out requests to get the report of the MRI and catheterization findings and to inquire about the scheduling of plaintiff's pending walk test. *Id.*

By July 26, 2019, the walk test had been performed, revealing "good tolerance with no shortness of breath or respiratory distress noted." *Id.* at 65. Plaintiff saw defendant to discuss the results of that test as well as the MRI and catheterization. *Id.* at 64-65.

Plaintiff saw defendant next on September 6, 2019. *Id.* at 62. Defendant noted that the pulmonologist had diagnosed plaintiff with vascular disease that was not significant, but that plaintiff needed further evaluation due to his ongoing shortness of breath with exertion. *Id.* Defendant requested a complete pulmonary function test from the institution's respiratory therapist, asking that the therapist contact him if he or she could not do the test so that defendant could submit a request that the test be performed at an outside provider. *Id.* Defendant also ordered a chest CT and noted that the cardiac catheterization and MRI were "within normal limits" but plaintiff's liver enzymes were elevated and should be monitored. *Id.*

After an October 7, 2019 appointment, defendant noted that the request for a chest CT had been denied but that he had resubmitted it, along with a request that plaintiff be seen by the pulmonology clinic at San Joaquin General. *Id.* at 59.

Another provider, Dharmvir Singh, saw plaintiff on November 20, 2019. *Id.* at 56. Plaintiff reported having a cough mostly at night or when lying down, with no phlegm. *Id.* Plaintiff also felt burning chest pain that was worse at night with a sour taste in the back of his throat reminiscent of a meal eaten earlier in the day. *Id.* Singh noted plaintiff's history of gastroesophageal reflux disease and ordered that plaintiff's medication for that condition be increased for three months followed by an endoscopy. *Id.* Singh also put in new requests for the pulmonology clinic and chest CT. *Id.*

When the CT scan was performed in December 2019, it revealed a mass on plaintiff's liver, which was eventually diagnosed as cancerous. *Id.* at 53-55. Defendant submitted an urgent referral for plaintiff to see an oncologist while continuing to provide treatment for plaintiff's other ailments. *Id.* at 22, 53-55.

Per the recommendations of the oncologist, defendant ordered hepatitis B testing and referred plaintiff to a hepatologist in early January 2020. *Id.* at 22, 53. Later the same month, defendant renewed plaintiff's lower-bunk accommodation and ordered a liver biopsy, expedited esophagogastroduodenoscopy ("EGD"), and colonoscopy. *Id.* at 52-53.

Plaintiff saw defendant on February 8, 2020 for plaintiff's continued shortness of breath with exertion, chest pain, intermittent stomach pain, and blood when blowing his nose. *Id.* at 47. Defendant noted that plaintiff had seen the pulmonologist on January 22, 2020 and would follow up with that provider in three months, after new pulmonary function and walk tests had been performed. *Id.* Defendant referred plaintiff to a gastroenterologist for his stomach pain. *Id.* On February 23, 2020, defendant followed up with plaintiff after his liver biopsy and, per the oncologist's recommendation, referred plaintiff urgently to the hepatobiliary surgeon at San Joaquin General to determine whether plaintiff was a candidate for liver surgery. *Id.* at 46.

On February 29, 2020, defendant submitted a new request for a colonoscopy after the prior request was denied and noted that plaintiff had been given a six-minute walk test that had showed no hypoxia (low oxygen levels in the tissues). *Id.* at 42-44. He charted a detailed review of plaintiff's ailments and the treatment courses being pursued therefor. *Id.* Defendant followed up with plaintiff the following month and made another referral to pulmonology. *Id.* at 40-41.

Plaintiff continued to complain of chest pain on April 4, 2020. *Id.* at 38. Defendant noted that the cardiologist believed that plaintiff suffered from heart failure "with preserved EF," a condition that could cause difficult or labored breathing (dypsnea). *Id.* The cardiologist recommended that plaintiff's beta-blocker medication be tapered off to address this issue and recommended a low-dose of loop diuretic. *Id.* Defendant noted that the beta-blocker had already been discontinued and substituted with another medication and that a referral to pulmonology had been made. *Id.*

On April 14, 2020, another medical provider noted that plaintiff denied shortness of breath, cough, chest pain, and vomiting and was afebrile. *Id.* at 37-38. Thus, plaintiff was cleared to attend his upcoming telemed pulmonology appointment (in-person appointments were avoided at this time due to the COVID-19 pandemic). *Id.*

6

  Defendant followed up with plaintiff on May 1, 2020, after plaintiff had received an MRI of his abdomen on April 22, 2020 and a radioembolization of his liver cancer. *Id.* at 36. The radioembolization procedure was considered successful, and defendant ordered another one. *Id.* On May 16, 2020, defendant told plaintiff that his colonoscopy (performed two days prior) revealed mild sigmoid diverticulitis and internal hemorrhoids. *Id.* at 35. On May 23, 2020, defendant checked on plaintiff after plaintiff received his second radioembolization, but the report from that procedure had not yet been made available to defendant. *Id.* Three days later, when the report came in, defendant ordered that plaintiff be returned to the radiology clinic in 4-6 weeks for a follow-up liver MRI. *Id.* at 34.

  At a May 30, 2020 appointment, defendant noted that the various diagnostic and function tests performed by the pulmonologist to assess plaintiff's shortness of breath had all come back normal. *Id.* at 33. Defendant requested an echocardiogram for plaintiff. *Id.* at 33-34. Defendant saw plaintiff on June 4, 2020 to discuss the expiring Tylenol 3 prescription he had for his back pain; plaintiff was doing well and did not need any medications. *Id.* at 33. Defendant last saw plaintiff on July 13, 2020 after plaintiff had received his post-radioembolization liver MRI. *Id.* at 32. Defendant was unable to access the MRI report and referred plaintiff back to the radiology clinic for follow-up.

  Defendant declares that plaintiff "never presented to me with symptoms of Legionnaire's disease. To my knowledge, he has never tested positive for Legionnaire's disease. After reviewing [plaintiff]'s medical record, I did not see any evidence that [he] ever suffered symptoms of Legionnaire's disease or tested positive for Legionnaire's disease." ECF No. 34-3 at 12.

  Plaintiff has also submitted voluminous medical records. ECF No. 41-2. For the most part, these records are duplicative of the records submitted by defendant. Other records not submitted by plaintiff support the summary provided above.

/////

/////

/////

### III. The Motion for Summary Judgment

#### A. Summary Judgment Standards

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment avoids unnecessary trials in cases in which the parties do not dispute the facts relevant to the determination of the issues in the case, or in which there is insufficient evidence for a jury to determine those facts in favor of the nonmovant. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986); *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994). At bottom, a summary judgment motion asks whether the evidence presents a sufficient disagreement to require submission to a jury.

The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, the rule functions to "'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). Procedurally, under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). If the moving party meets its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248; *Auvil v. CBS "60 Minutes"*, 67 F.3d 816, 819 (9th Cir. 1995).

A clear focus on where the burden of proof lies as to the factual issue in question is crucial to summary judgment procedures. Depending on which party bears that burden, the party seeking summary judgment does not necessarily need to submit any evidence of its own. When the opposing party would have the burden of proof on a dispositive issue at trial, the moving party need not produce evidence which negates the opponent's claim. *See, e.g., Lujan v. National*

*Wildlife Fed'n*, 497 U.S. 871, 885 (1990). Rather, the moving party need only point to matters which demonstrate the absence of a genuine material factual issue. *See Celotex*, 477 U.S. at 323-24 ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id*. at 322. In such a circumstance, summary judgment must be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id*. at 323.

To defeat summary judgment the opposing party must establish a genuine dispute as to a material issue of fact. This entails two requirements. First, the dispute must be over a fact(s) that is material, i.e., one that makes a difference in the outcome of the case. *Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Whether a factual dispute is material is determined by the substantive law applicable for the claim in question. *Id*. If the opposing party is unable to produce evidence sufficient to establish a required element of its claim that party fails in opposing summary judgment. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322.

Second, the dispute must be genuine. In determining whether a factual dispute is genuine the court must again focus on which party bears the burden of proof on the factual issue in question. Where the party opposing summary judgment would bear the burden of proof at trial on the factual issue in dispute, that party must produce evidence sufficient to support its factual claim. Conclusory allegations, unsupported by evidence are insufficient to defeat the motion. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Rather, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue

for trial. *Anderson*, 477 U.S. at 249; *Devereaux*, 263 F.3d at 1076. More significantly, to demonstrate a genuine factual dispute, the evidence relied on by the opposing party must be such that a fair-minded jury "could return a verdict for [him] on the evidence presented." *Anderson*, 477 U.S. at 248, 252. Absent any such evidence there simply is no reason for trial.

The court does not determine witness credibility. It believes the opposing party's evidence, and draws inferences most favorably for the opposing party. *See id*. at 249, 255; *Matsushita*, 475 U.S. at 587. Inferences, however, are not drawn out of "thin air," and the proponent must adduce evidence of a factual predicate from which to draw inferences. *Am. Int'l Group, Inc. v. Am. Int'l Bank*, 926 F.2d 829, 836 (9th Cir. 1991) (Kozinski, J., dissenting) (citing *Celotex*, 477 U.S. at 322). If reasonable minds could differ on material facts at issue, summary judgment is inappropriate. *See Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). On the other hand, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). In that case, the court must grant summary judgment.

Concurrent with the motion for summary judgment, defendant advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. ECF No. 34-1; *see Woods v. Carey*, 684 F.3d 934 (9th Cir. 2012); *Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

### B. No Rational Factfinder Could Find that Defendant Acted with Deliberate Indifference to Plaintiff's Medical Needs

The Eighth Amendment protects prisoners from inhumane methods of punishment and from inhumane conditions of confinement. *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006). Extreme deprivations are required to make out a conditions-of-confinement claim, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. *Hudson v. McMillian*,

503 U.S. 1, 9 (1992). "Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety." *Johnson v. Lewis*, 217 F.3d 726, 731-32 (9th Cir. 2000) (quotations and citations omitted).

To succeed on an Eighth Amendment claim predicated on allegedly deficient medical care, a plaintiff must establish that: (1) he had a serious medical need and (2) the defendant's response to that need was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A serious medical need exists if the failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain. *Jett*, 439 F.3d at 1096. A deliberately indifferent response may be shown by the denial, delay or intentional interference with medical treatment or by the way in which medical care was provided. *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). To act with deliberate indifference, a prison official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Thus, a defendant will be liable for violating the Eighth Amendment if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id*. at 842.

Here, the evidence submitted by the parties does not raise a triable issue of material fact as to whether defendant was aware of a substantial risk of serious harm to plaintiff and acted improperly or failed to act in response. Significantly, the court could locate no item of evidence that indicated that plaintiff ever suffered from undiagnosed Legionnaire's disease, that he was diagnosed with Legionnaire's disease, or that a failure to treat or a delay in treatment of plaintiff's various abdominal conditions caused these conditions to progress or cause him greater suffering than he would have undergone with expeditious treatment. Rather, the evidence showed that defendant (along with plaintiff's other medical providers) responded continually to his reports of symptoms – making referrals, prescribing medications, and ordering diagnostic tests. Plaintiff's opposition to the motion for summary judgment contains no evidence supporting his claims but is

rather a series of speculations resulting from plaintiff's apparent belief that, because defendant did not cure all of plaintiff's conditions, defendant acted with deliberate indifference. The Eighth Amendment does not require that medical providers cure every ailment suffered by a prisoner; it is a sad fact of life that many people suffer from incurable conditions or conditions that require ongoing or lengthy treatment. Because plaintiff has not rebutted defendant's evidence that he took reasonable steps to address plaintiff's health conditions, summary judgment should be entered in defendant's favor.[2]

## IV.     Recommendation

In accordance with the above, it is RECOMMENDED that defendant's January 31, 2022 motion for summary judgment (ECF No. 34) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated: May 5, 2022.

_____
EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

---

[2] Defendant also argues that he should be granted qualified immunity. Because the court finds that no reasonable factfinder could find that defendant violated the Constitution, it is not necessary to address this additional argument. Should the District Judge decline to adopt these findings and recommendations, the court will address the propriety of qualified immunity in this case.